659 So.2d 1174 (1995)
CITY OF RIVIERA BEACH, a Florida municipal corporation, incorporated under the laws of the State of Florida, Appellant,
v.
John T. SHILLINGBURG and Joan B. Taylor, Appellees.
No. 93-1981.
District Court of Appeal of Florida, Fourth District.
August 16, 1995.
*1176 Andrew DeGraffenreidt, III, Riviera Beach, for appellant.
Luther M. Taylor, Palm Beach Gardens, and Michael J. Ryan, Minneapolis, MN, for appellees.
Nancie G. Marzulla and Leonard A. Leo, Washington, DC, for amicus curiae-defenders of Property Rights.
David J. Russ, Tallahassee, for amicus curiae-Department of Community Affairs.
PARIENTE, Judge.
The City of Riviera Beach (Riviera Beach) appeals the trial court's determination of a regulatory taking of landowners' submerged lands. We reverse because the enactment of the comprehensive land use plan did not per se deprive landowners of their property without just compensation and landowners' as-applied challenges are not ripe for review.
The subject of the claimed regulatory takings are two strips of submerged land running from Singer Island and extending into the Intracoastal waterway separately owned by appellees John Shillingburg and Joan Taylor and located within the corporate limits of the City of Riviera Beach. Although the trial court's order deals solely with the submerged lands, for each property owner, the submerged land is part of a larger parcel of property.
John Shillingburg (Shillingburg) initially purchased his property in 1977. The first parcel consists of: 1) uplands east of A1A where he has his residence; 2) another area of uplands between A1A and Lake Worth (the Intracoastal waterway); and 3) the submerged land which extends out into the intracoastal in a strip 50 feet wide by 3,000 feet long. In 1987, Shillingburg purchased an adjacent 50 foot wide parcel of submerged land, also 3,000 feet long, so that the submerged land portion of his property comprises a strip measuring 100 feet by 3,000 feet.
The other property owner, Joan Taylor (Taylor), acquired legal title to her property in 1985 and holds title for herself (50%) and for Francis T. Ryan and Virginia L. Ryan (50%). The trial court found that from 1971 to the present, Taylor has had an equitable interest in the property presumably because a portion of the property was previously owned by her husband, Luther M. Taylor. As in the case of Shillingburg, the Taylor submerged land is part of a larger parcel comprised of two upland parcels separated by a strip of submerged land 100 feet wide by 3,000 feet long, running east to west at the bottom of Lake Worth. One part of the larger parcel known as Little Munyon Island is within the jurisdiction of North Palm Beach and is the subject of our opinion in Taylor v. North Palm Beach, 659 So.2d 1167 (Fla. 4th DCA 1995).
The trial court found that both the Taylor and Shillingburg submerged lands are of the same general nature in that they are part of a series of subdivided strips of land of various widths running parallel to each other and perpendicular to Singer Island west of A1A extending out to the bulkhead line originally established by Riviera Beach prior to 1967. To the south is single-family residential development built on fill over submerged lands. Just past the submerged lands to the east, across A1A on Singer Island, is some of the most intense high-rise residential real estate development in Palm Beach County. To the north is MacArthur State Park, purchased by the State of Florida for a substantial sum of money consisting of a beach and wetlands east of A1A and wetlands and mudflats west of A1A extending out to Big Munyon Island *1177 which is also part of the state-purchased property.

RECENT HISTORY OF REGULATION
Riviera Beach, as mandated by the Local Government Comprehensive Planning & Land Development Regulation Act, chapter 163, Florida Statutes (1989), adopted a comprehensive land use plan (plan) on December 12, 1989. At the time of the initial submission of the plan by Riviera Beach, the properties owned by landowners within Riviera Beach were zoned as RS-5, which is a single-family residential zoning designation. However, since 1981, the submerged portions of the properties had been the subject of Riviera Beach's comprehensive planning efforts and carried a land use designation of "special preservation." Because the portions of the properties in question are submerged lands, their natural character could not be altered without applying for and receiving permit approval from various state agencies. This has been the case during the entire time Shillingburg and Taylor have owned the submerged lands.
The plan submitted by Riviera Beach indicated that landowners' properties were prospectively intended for residential uses in accordance with the existing zoning. On February 9, 1990, the Department of Community Affairs issued a "Statement of Intent and Notice of Intent" to find the plan not in compliance with the dictates of the Local Comprehensive Planning Act.[1] The Department of Community Affairs expressly advised Riviera Beach to take remedial action to revise the plan "to establish a lower density for areas designated as preservation or utilize other land use strategies or mechanisms that will insure the protection of the referenced environmentally sensitive lands."
In response to these directives, Riviera Beach amended the plan to provide the following:
Special Preservation  mangroves, wetlands, and special estuarine bottom lands. These mangroves and special estuarine bottom lands are protected by federal, State and local agencies involved in the wetlands preservation, dredge and fill permitting, and other hydrological modifications. It is the expressed policy objective of the City to preclude any development of submerged lands, including but not limited to mangroves, wetlands, and estuarine bottom lands, to the maximum extent permissible by law. It is further the policy of the City to oppose any applications for dredge or fill permits pending before applicable State or Federal agencies. This policy objective shall not be construed, nor implemented to impair or preclude judicially determined vested rights to develop or alter submerged lands.

The city shall, upon enactment of this plan, prepare a study of the specific planning and legal issues pertinent to the bottomlands. The research will be designed to determine uses that would be compatible with the city's preservation policies contained in the Coastal Management Element including Objective 1.1 which mandates no loss of the natural shoreline bordering the estuary.
(Emphasis added). With the amended language and other changes, the plan was finally approved by the Department of Community Affairs on December 19, 1991.
As a result of the amendment to the land use plan, both Shillingburg and Taylor brought separate actions against Riviera Beach claiming a regulatory taking of their property. These actions were ultimately consolidated. Shillingburg's four-count complaint alleged that he made an application to construct a viewing dock on his submerged land and Riviera Beach had denied his request for a permit. He therefore sought a writ of mandamus directing Riviera Beach to approve his permit for a dock; a declaratory judgment that there had been a taking of his property; and monetary damages for a regulatory taking.
After the complaint was filed and before trial, based on Shillingburg's request for a *1178 dock, Riviera Beach proposed an amendment to the plan which allowed "private residential fishing or viewing platforms and docks for nonmotorized boats." Despite the pending proposed amendment which would permit his requested use, Shillingburg maintained at trial that there still had been a taking of his property on grounds that he had planned to put a guest house on the property, but Riviera Beach had orally advised against it which was why he decided to construct a dock.
Taylor's original complaint alleged that she was prohibited from building a dock, a viewing platform or a single family residence as she had been informed that "no docks would be allowed and that no construction of any type would be allowed." At trial her testimony revealed that no application for a permit, development order or for an amendment to the plan had ever been submitted to Riviera Beach for any use, although she contended that her plan was to build a house on stilts over her submerged land. In fact, the architect hired by Taylor to develop architectural plans admitted that no plans had ever been offered Riviera Beach for its review.

THE FIRST "FINAL" JUDGMENT
Following the non-jury trial, the trial court issued a final judgment finding that neither landowner's complaints were ripe for review. As to the Shillingburg property, the trial court found that Riviera Beach had initiated an amendment to its land use plan to allow the construction of the viewing dock and that the amendment had been approved by Riviera Beach and had been forwarded to the Department of Community Affairs. The trial court then declared that:
[B]ased on the undisputed fact that the Defendant has made no final decision relating to the nature and extent of development that would be permitted on the Plaintiff's property, it cannot be determined by this Court that the regulations of the Defendant as applied to Plaintiff's property are so restrictive as to constitute a taking of Plaintiff's property by the Defendant City of Riviera Beach.
The trial court granted a stay pending a response from the Department of Community Affairs and Riviera Beach's actions in response to the Department of Community Affairs's decision. The parties were instructed to notify the trial court within four months or sooner "if the Department of Community Affairs and the City of Riviera Beach have taken final definitive action with regard to the Plaintiff's application for a viewing dock."
Regarding landowner Taylor's property, the trial court likewise concluded that her claim was not ripe in that she had failed to apply for or request any developmental order or permits. The trial court's "final judgment" stated in pertinent part that:
Based upon the facts in evidence regarding this matter, the Court cannot determine that the regulations applicable to the Plaintiff's property are so restrictive so as to constitute a taking of said property by the Defendant municipality. Because the Plaintiff has never applied for or requested any development orders or permits to develop Plaintiff's property, this Court has no factual evidence upon which to determine the nature or extent of the development that may be permitted on Plaintiff's property.
Further, the evidence is undisputed that there are in fact administrative procedures available to the Plaintiff, which would permit the modification of existing zoning and land use regulations affecting the Plaintiff's property. It is evident that both the Defendant and private parties have utilized these administrative procedures to seek modifications and amendments to the Defendant's current comprehensive land use plan regulations.
Nonetheless, the trial court also stayed Taylor's action for four months, even though there were no pending governmental proceedings as there were in Shillingburg's case.

THE SECOND JUDGMENT
In the interim four months, the Department of Community Affairs approved the amendment to the land use plan permitting Shillingburg's dock. Nevertheless, both landowners moved for a partial summary judgment, claiming that the enactment of the plan constituted a taking because, as the amendment to the plan demonstrated, they *1179 could do nothing more than put viewing docks on their submerged lands. The trial court, without an additional evidentiary hearing, entered a lengthy order determining that by virtue of the enactment of the plan, the economic viability of landowners' properties had been destroyed. The trial court apparently accepted Shillingburg's earlier contention during trial that he did not consider the right to construct a viewing dock to be an economically viable use of his property and that he had pursued the permit only to see what, if anything at all, could ever be constructed on his submerged land. The trial court concluded that, based on what Shillingburg had gone through just to get the viewing dock, including the stringent conditions and limitations of the permit, he had "pushed the outer limits of the envelope."
Concerning landowner Taylor, the trial court determined it would be an act of futility to require her to pursue administrative procedures, since the use of her property was clearly limited only to a dock based on what had been approved for Shillingburg. Because the trial court did not consider a viewing dock to be an economically viable use of the submerged lands, it found that the value of landowners' submerged properties had been essentially destroyed.
Even though in its initial final judgment the trial court had definitively determined that the Taylor case was not ripe for resolution because of Taylor's failure to go through the administrative process, in its partial judgment of taking, the trial court rejected Riviera Beach's contention that Taylor should have to "go to the expense of doing extensive plans, specifications, and engineering to obtain permits from the Corps of Engineers, DERM, DNR, and possibly other agencies like the South Florida Water Management District and then come to the City of Riviera Beach to request a change in the paramount law, the Comprehensive Land Use Plan." To require Taylor to go through this process, according to the trial court, would be:
[B]ackwards to any common sense; it is backwards to the way professional land planners and architects proceed; and, it places the burden of governing on the wrong foot. Plaintiffs have the right to rely on the plain language of the Defendant's Comprehensive Land Use Plan; they have the right to be guided by common sense; and, they have the right to be dealt with forthrightly and not shuffled off on a wild goose chase.
The trial court, in essence, reversed its previous position that the controversies were not ripe for review and found a taking even though Taylor had made no application in the interim and even though Shillingburg received permission to build the viewing dock which he requested.

FACIAL CLAIMS
In addressing the propriety of the trial court's action, we must first consider the nature of landowners' takings claims. As we discussed in Taylor, takings challenges fall broadly into two categories  facial takings claims and as-applied claims. In this case, we cannot conclusively determine from landowners' pleadings whether they raised facial takings claims, as-applied takings claims or both. While it appears that the claims were presented and tried based on as-applied challenges, the trial court's granting summary judgment may have, in part, been predicated on a theory of a facial taking.
We conclude that landowners could not successfully maintain a facial challenge to the plan. While the amendment to the plan, which led landowners to file their takings claims, indicates that Riviera Beach's policy objective is to preclude development of submerged lands, it also states that following enactment of the amendment, Riviera Beach will conduct research and determine those "uses that would be compatible with the city's preservation policies." As such, the language of the plan itself contemplates viable uses for the property consistent with Riviera Beach's policy objectives. The fact that the plan was amended to allow for a dock as requested by Shillingburg demonstrates the built-in flexibility of the plan. See Glisson, 558 So.2d at 1030.
As we noted in Taylor, where the land use ordinance leaves open the possibility of reasonable use, a facial challenge will likely be unsuccessful. See Agins v. City of Tiburon, *1180 447 U.S. 255, 260-61, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980). Because the plan contemplates uses for the subject properties and provides a mechanism whereby landowners could seek additional uses of their properties, we find that any facial challenge based on just compensation principles must fail as a matter of law.

AS-APPLIED CLAIMS  RIPENESS
We next consider landowners' challenges as applied to their particular property. Any analysis in an as-applied regulatory taking claim must start with the threshold question of ripeness: Has there been a final decision from the appropriate governmental entity as to the nature and extent of the development that will be permitted? Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186-94, 105 S.Ct. 3108, 3116-20, 87 L.Ed.2d 126, 138-43 (1985); Eide v. Sarasota County, 908 F.2d 716, 720-21 (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). Florida courts have likewise adopted the ripeness requirement. See Taylor; Tinnerman v. Palm Beach County, 641 So.2d 523, 526 (Fla. 4th DCA 1994); City of Jacksonville v. Wynn, 650 So.2d 182 (Fla. 1st DCA 1995); Glisson v. Alachua County, 558 So.2d 1030, 1034 (Fla. 1st DCA), review denied, 570 So.2d 1304 (Fla. 1990).
In our recent opinion in Taylor and in Tinnerman, we discussed the practical reasons for the ripeness doctrine both as a means to allow disputes to be resolved politically or administratively outside the judicial process and to prevent the trial court from making decisions in the abstract. As explained by the United States Supreme Court in Williamson County:
Our reluctance to examine taking claims until ... a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a `taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty;" this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.
473 U.S. at 190-91, 105 S.Ct. at 3119 (citations omitted); Wynn, 650 So.2d at 187. In this case, we do not find either Shillingburg's or Taylor's claim ripe for review because Riviera Beach has not been given a meaningful opportunity to arrive at a final, definitive position regarding how it will apply the plan and whether it will approve an amendment based on the specifics of what each landowner submits.
Shillingburg applied for and received permission to build a dock  the only use for which he sought a permit. In fact, the trial court, in express recognition of the need to allow Riviera Beach to respond to a requested change in the permissible land uses, stayed the proceedings until there was a final decision as to his request to build the dock. We will not indulge the presumption that by applying for and receiving permission to build a dock, the factual predicate of ripeness has been satisfied concerning the nature and extent of other permissible development of the property. Riviera Beach, and the other state agencies involved in the permitting process, acted upon the application in front of them  presumably believing that Shillingburg, in good faith, was asking for what he actually wanted.
Decisions on ripeness issues are fact-sensitive, Eide, 908 F.2d at 727, but generally a land use agency can make a final decision only when it has an application before it. Normally, unless there has been at least one "meaningful application," the claim cannot be said to be ripe for review. Glisson, 558 So.2d at 1030 (adopting MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 353 n. 8, 106 S.Ct. 2561, 2568 n. 8, 91 L.Ed.2d 285, reh'g denied, 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986)); see also Wynn. We cannot consider Shillingburg's application for a dock to be a meaningful application if Shillingburg's actual intent was to use the property *1181 to build a residence. The factual scenario here is somewhat unique because, in most cases, the landowner applies for the desired use, enabling the trial court to render a decision only after the agencies involved have finally acted upon the contemplated use. This makes sense because one measure of a landowner's reasonable economic expectation for its property is the landowner's proposed use of the property, as evidenced by its application.
In Southern Pacific Transportation Co. v. City of Los Angeles, 922 F.2d 498, 504 n. 7 (9th Cir.1990), cert. denied, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991), the ninth circuit held that an application for a variance seeking to erect a fence, instead of the required wall, around a parking lot was only "minor," and thus, not a meaningful application because the denial of the fence variance "gives no indication of how the city would respond to a major development application." See also Lake Nacimiento Ranch Co. v. County of San Luis Obispo, 841 F.2d 872, 876-77 (9th Cir.1987), cert. denied, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988) (finding the submission of an "informal" draft of a development plan for comments by land use agency staff members was not a meaningful application).
As the landowners did in Tinnerman, landowners here assert that it would have been futile for them to pursue any other development. However, this assertion ignores the fact that landowners did not request an amendment to the plan to permit more intensive use or submit a plan of proposed development. Neither did landowners intervene as interested parties after the Department of Community Affairs's Notice of Intent during the time the plan was being adopted. See § 163.3184(10)(a), Fla. Stat. (1989).
A limited exception to the ripeness requirement might exist where, by virtue of the past history, repeated submissions would be futile. Eide, 908 F.2d at 726 n. 17. Further, where the governmental agency effectively concedes that any other development would be impermissible, this can negate the requirement of pursuing further administrative remedies and the governmental action is effectively treated as a final decision. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1576 (11th Cir.1989). However, neither exception is applicable here.
Here, the trial court's decision in granting summary judgment appears to rest on its belief that any attempt to develop the property would unquestionably be opposed by all agencies involved in the decision-making process. However, this conclusion is clearly disputed and certainly not conclusively established from the facts in the record.
Landowners additionally rely on Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), for the proposition that the ripeness doctrine should not apply here. However, in that case, the United States Supreme Court did not consider the ripeness issue because the South Carolina Supreme Court did not consider the ripeness issue. The originally challenged statute completely prohibited all residential development on the property. In the interim, before the case made its way to the United States Supreme Court, the underlying statute had been amended to authorize the issuance of special building permits which might have allowed the landowner to develop his beachfront property. In responding to the state's ripeness argument, the Supreme Court commented:
We think these considerations would preclude review had the South Carolina Supreme Court rested its judgement on ripeness grounds, as it was (essentially) invited to do by the Council... . The South Carolina Supreme Court shrugged off the possibility of further administrative and trial proceedings, however, preferring to dispose of Lucas' taking on the merits.
Id. at ___, 112 S.Ct. at 2891. Had the South Carolina Supreme Court remanded the case for Lucas to make a meaningful attempt at having a "final decision" regarding allowed development on the property, then it appears the United States Supreme Court would have likely affirmed that decision.
Both Taylor and Shillingburg additionally rely on Vatalaro v. Department of Environmental Regulation, 601 So.2d 1223 (Fla. 5th DCA), review denied, 613 So.2d 3 (Fla. 1992), *1182 for authority that we should affirm the trial court's judgment. However, in Vatalaro, the Department of Environmental Regulation (DER), the entity responsible for issuing dredge and fill permits, had denied Vatalaro's permit application and "determined the property was suitable only for limited passive recreational use." 601 So.2d at 1229. Thus, a final decision had been made by the responsible agency.
We do not view Riviera Beach's approval of the requested dock as a concession that only the dock can be built. As to Shillingburg, the only use he requested was approved; as to Taylor, there has been not even one meaningful application. While we understand the trial court's concerns that a landowner should not have to go to great expense to have an agency finally deny its requested use if the denial is inevitable, we may not engage in speculation as to how the involved agencies will respond when faced with a meaningful application.[2]
Here, there is an additional sound reason for requiring landowners to take the necessary steps and apply for the use that they claim is an economically viable use of their property. Any further development would necessarily involve filling the submerged lands, and thus, requests for an amendment to the plan and a request to fill the submerged lands would not solely be the decision of Riviera Beach but would require approval from state agencies, including the DER. See, e.g., Namon v. Department of Envtl. Reg., 558 So.2d 504 (Fla. 3d DCA), review denied, 564 So.2d 1086 (Fla. 1990); Vatalaro.
Riviera Beach should not be held responsible in damages for a regulatory taking where it has not unequivocally prevented all economically viable use of the property, especially where the decision as to the intended uses is not solely its to make and where it appears that other agencies may indeed be responsible for opposing any further development. See, e.g., Karatinos v. Town of Juno Beach, 621 So.2d 469 (Fla. 4th DCA 1993), review denied, 634 So.2d 625 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 2133, 128 L.Ed.2d 864 (1994); Taylor. We agree with the trial court's reasoning in its first "final judgment" and find the second, partial judgment, which is the subject of this nonfinal appeal, to be unsupported by substantial, competent evidence. See City of Key West v. Berg, 20 Fla. L. Weekly D1247 (Fla. 3d DCA June 2, 1995); Wynn; Tinnerman.

SUBMERGED LANDS PART OF GREATER PARCELS
Although we reverse the trial court's determination that there has been a compensable taking on grounds that neither case was ripe for judicial review, we are compelled to comment upon the contention of the Department of Community Affairs, as amicus curiae, that there had not been a taking because the plan did not prohibit all use of landowners' property taken as a whole. We note, however, that this argument had not been squarely presented to the trial court below and, as such, we would be reluctant to reverse on this issue alone. See McGurn v. Scott, 596 So.2d 1042 (Fla. 1992); Kozich v. Hartford Ins. Co. of Midwest, 609 So.2d 147 (Fla. 4th DCA 1992). However, landowners have not moved to strike the Department of Community Affairs brief or otherwise argue that the argument has been waived. Because it is a significant issue and because this controversy may inevitably be back in court if administrative efforts do not prove fruitful, we comment on the unitary use argument raised by the Department of Community Affairs.
A prohibition against development of a portion of a landowner's property does not itself constitute an unconstitutional taking; a proper analysis of a takings claim requires consideration of the subject property in its entirety. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); Department of Envtl. *1183 Reg. v. Schindler, 604 So.2d 565, 568 (Fla. 2d DCA), review denied, 613 So.2d 8 (Fla. 1992); Department of Envtl. Reg. v. MacKay, 544 So.2d 1065 (Fla. 3d DCA 1989); Department of Transp. v. Jirik, 471 So.2d 549 (Fla. 3d DCA 1985), decision approved, 498 So.2d 1253 (Fla. 1986); Fox v. Treasure Coast Regional Planning Council, 442 So.2d 221 (Fla. 1st DCA 1983).
In Schindler, the second district concluded that there had not been a taking even though the DER had refused the landowners' application to fill submerged land, which effectively denied them use of 1.85 acres of their 3.5 acre tract. Similarly, in MacKay, the third district held that the landowners had failed to show that a taking had occurred, even though the DER had denied the landowners' application to fill 2.5 acres of submerged land, which constituted the vast majority of their 3.2-acre tract of land.
In determining whether portions of a landowner's property should be considered as a whole or treated separately, courts have held that there is a presumption that, "[w]here it is established that the parcels in question are physically contiguous, a presumption arises that the parcels are one unit." Schindler, 604 So.2d at 567; Jirik, 471 So.2d at 553. Further, in determining whether the property should be treated as a single tract, courts have held that a number of additional factors, indicating the "unity of use" or "unity of ownership" of the property as a whole, should also be considered, including the intent of the owner and particular factual circumstances of the case. Jirik, 471 So.2d at 554.
Here both 100-foot strips of submerged lands are part of larger tracts. Further, the particular facts of both cases appear to additionally support treatment of the subject properties as undivided parts of single tracts of land. In the Shillingburg case, landowner Shillingburg testified as to his own contemplation of unitary use, stating that he purchased the parcels, "mainly because it would give me ocean-to-intracoastal land, which is quite valuable and quite unique, and I thought when I retire, then I would have the option of developing it or putting a guest house on it or boat dock, or using it." As to the Taylor property, unity of ownership suggesting that the property be considered as a whole is demonstrated by the fact that title to the 100-foot strip submerged land had passed together with the larger tracts of uplands by a single deed. There was no indication of separate platting of the properties or other separate treatment in the public records, which would justify a contrary presumption that these parcels were intended to be treated separately. Compare Jirik, 471 So.2d at 555. We realize that some of these deficiencies in proof may result from the failure of Riviera Beach to raise the unitary use issue, so we do not, by our comments, prejudge this issue.
Lastly, we must not forget that we are dealing with land under water. Landowners do not have an absolute and unlimited constitutional right to alter the character of their submerged lands in order to use them for a purpose for which the lands were unsuited in their natural state and which would result in injury to the rights of others. Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1382 (Fla. 1981), cert. denied sub nom. Taylor v. Graham, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981) (quoting Just v. Marinette County, 56 Wis.2d 7, 201 N.W.2d 761, 768 (1972)); Vatalaro.

CONCLUSION
We therefore reverse the finding of a regulatory taking. We remand landowners' as-applied claims with directions to the trial court to dismiss those claims as not being ripe for judicial review.
WARNER, J., and SMITH, FREDERICKA, Associate Judge, concur.
NOTES
[1] Under the Act, failure to meet the schedule for submission of a comprehensive plan subjects the governmental entity to sanctions pursuant to section 163.3184(11)(a), Florida Statutes (1989), which include cut-off of funds to increase capacity of roads, bridges, water and sewer systems and ineligibility for grants under various state programs.
[2] Recent legislation, effective October 1, 1995, may address the trial court's concerns by putting the burden on the governmental entities to advise the landowner as to the extent of the permissible uses or to make a settlement offer within 180 days after the landowner files a claim. However, this legislation is prospective in application. Ch. 95-181, Laws of Fla. See Taylor v. North Palm Beach, 659 So.2d 1167 (Fla. 4th DCA 1995).